**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| Diane Stoehrer, | ) | Case No: 9:17-cv-02911-DCN |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Grayco, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**COMPLAINT**

As and for her Complaint, Plaintiff Diane Stoehrer ("Diane") states and alleges the following against Defendant Grayco, LLC ("Defendant"):

**STATEMENT OF CLAIM**

1. The claims set forth herein relate to Defendant's wrongful termination of Diane in contravention of public policy and Defendant's own Whistleblower Policy. Essentially, Defendant required Diane to either become complicit in widespread company theft or suffer adverse employment actions if she continued to report the misconduct, all against the backdrop of paying Diane inferior and unequal wages based on her gender in violation of the Equal Pay Act.

**PARTIES**

2. Diane is domiciled in the State of South Carolina, as she permanently resides at 1604 Lafayette St., Beaufort, South Carolina 29902.

3. Defendant is a limited liability company organized under the laws of South Carolina,

1

with its principal place of business in South Carolina.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Diane has alleged a cause of action under the Fair Labor Standards Act, 29 U.S.C. § 206(d) (Equal Pay Act).

5. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper under § 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to this claim occurred in the District of South Carolina, Beaufort Division.

## FACTS

7. Diane began working as a manager in the "Housewares" department at the Defendant's Beaufort store location, located at 136 Sea Island Pkwy, Beaufort, SC 29907 (herein "Beaufort location") on or around April 9, 2014.

8. At the time of her hiring, Diane earned $12.00 per hour.

9. On or around June 2014, Diane asked then-General Manager Phil Goodlove to be evaluated for a raise.

10. By March 2015, Mr. Goodlove had increased Diane's pay rate incrementally to $14.00 in recognition of her remedying massive inventory issues in Housewares, mastering of Defendant's point of sales software, and a substantial increase in the Houseware department's profits between June 2014 and March 2015.

11. Prior to the creation of the position of "Inventory Manager" in 2015, Defendant did not have an established inventory control system to assess the accuracy of the counts in the computer, nor did it employ a third-party inventory control company.

12. On September 27-29, 2014, Defendant closed the store for a three-day inventory evaluation, during which time Diane and twenty or thirty other employees were tasked with taking inventory.

13. This inventory process revealed massive discrepancies between product on the shelves and what was represented in Defendant's computer system.

14. Given these discrepancies, Defendant realized it could neither order new products based on what the computer system reflected, nor accurately evaluate inventory based on the information in the system.

15. Thereafter, Defendant decided to create the position of Inventory Manager to centralize the inventory control process.

16. Based on her accomplishments in Housewares described in Paragraph 10, in early 2015, Diane was recommended for the Inventory Manager position by Mr. Goodlove, the current Office Manager, Brittany Robinson, and the current Receiving Manager, Crystal Headstrom.

17. On or around March 2015, Diane's position changed to Inventory Manager, and she was paid at a rate of $14.00 per hour.

18. Diane was not provided a formal job description for "Inventory Manager" or written job duties.

19. Instead, Diane performed the duties and responsibilities that proper inventory management required, including the following non-exhaustive list:

    a. Verifying inventory two times a year (referred to by Defendant as "cycle-counting");
    b. Verifying high-priced product inventory more often, at Diane's discretion, which she determined to be once a month;
    c. Auditing cashier return receipts daily;
    d. Assisting the Receiving Department in the creation of a store-wide item database;
    e. Maintaining certain functions in the item database (such as barcode maintenance, unit of measure, price adjustments, global modification of items, correcting mistakes made by others who created items, etc.);
    f. Assisting the Receiving Department with receiving new product, placing new product in the store;
    g. Researching and determining "operational" mistakes or problems (i.e. mistakes in tagging, receiving errors, cashier errors, transfer errors, etc.);
    h. Initiating sales flyers;
    i. Controlling all sales implemented in store;
    j. Putting together donation of products (listing, donating, and returning receipts to corporate);
    k. Loss prevention; and
    l. Creating and implementing "12 month and over report of inventory" to rid Defendant of dead or non-moving inventory.

20. Diane, through accident or happenstance, learned that other department heads were paid $3.00-$10.00 more per hour than her own hourly rate. On or around July 2015, Diane approached Mr. Goodlove about being evaluated on her performance so that she might be considered for a raise.

21. On or around August 2015, Mr. Darren Wallace—a former General Manager of Grayco's Hilton Head location and a friend of Grayco President Mr. Ben

Tomlinson—was brought into the Beaufort location purportedly as a bulk product buyer to make bulk deals for all of Defendant's locations.

22. Following Mr. Goodlove's recognition of Diane's impressive performance in her new position as Inventory Manager, on or around November 2015, Mr. Wallace (although not Diane's supervisor) called Diane into his office and gave her a $1.00 per hour raise, which brought her hourly pay rate to $15.00.

23. In that meeting, Mr. Wallace said, "Here's your measly dollar," referring to Diane's raise, and promised to consider another raise in a few months.

24. Diane related this comment to several department heads at the time.

25. When Diane approached Mr. Wallace once more toward the end of his tenure, Mr. Wallace told Diane that he was working on giving her another raise.

**First Theft Investigation**

26. A few months into her new position as Inventory Manager, Diane began noticing a pattern of theft from the Beaufort location. She investigated and narrowed the culprit down to one of three current employees, and reported the theft to then-General Manager Phil Goodlove.

27. Upon information and belief, Mr. Goodlove alerted Grayco's Chief Financial Officer, Holly McKown, and Lisa Cartin in Human Resources ("HR") to the apparent theft, and when no investigation or any action was taken, Mr. Goodlove reported it to Mr. Tomlinson, Grayco's President.

28. Mr. Goodlove's employment was terminated shortly after reporting the theft that Diane had identified.

29. On or around January 2016, Mr. Wallace was formally moved into the General Manager position at the Beaufort location as Mr. Goodlove's replacement.

30. On or around November 2016, Mr. Robert Loughlin, at that time a customer service representative, observed Mr. Wallace stealing $400.00 in cash from the sale of outdated inventory.

31. Mr. Loughlin asked Diane for advice on how to proceed. Diane advised Mr. Loughlin to report the theft to HR, but Mr. Loughlin did not do so.

32. During his tenure as General Manager at the Beaufort location, Mr. Wallace asked Diane on numerous occasions to hide inventory losses (including, for example, $20,000 in missing Stihl equipment and accessories, $2,000 in Columbia attire, and other miscellaneous large disappearances of inventory) that she had observed, uncovered, and reported to him.

33. Diane instead began compiling documentation of the theft, which she then presented to Ms. McKown and Ms. Cartin on December 27, 2016.

34. Subsequently, Ms. McKown and Ms. Cartin requested that Diane participate in an investigation of Mr. Wallace's theft.

35. Ms. McKown and Ms. Cartin made it clear that Diane would be responsible for the active "investigating" and compiling of information related to the theft because, as Inventory Manager, she was in the best position to accomplish the task.

36. At the time of the December 27, 2016 meeting, Defendant had no whistleblower policy in place. Nonetheless, Ms. McKown and Ms. Cartin assured Diane that they would do their best to keep her participation in the investigation confidential and that she would face no adverse employment actions for participating.

37. Diane agreed to participate in the investigation on the condition she would not have to confront Mr. Wallace herself, and Ms. McKown and Ms. Cartin assured her she would never be required to do so.

38. At or around the time of the Wallace investigation, Defendant instituted a Whistleblower Protection Policy (herein, "the Whistleblower Policy").

39. The Whistleblower Policy provided that: "No employee who in good faith reports a violation or cooperates in the investigation of a violation shall suffer harassment, retaliation or adverse employment consequences." The Whistleblower Policy also expressly stated that employees "have a duty to report" actual or suspected "unethical or illegal conduct." **Exhibit A**.

40. On January 30, 2017, after a little over a month of compiling evidence of Mr. Wallace's theft, a series of meetings took place culminating in Diane being summoned by HR for a closed-door meeting with Mr. Wallace, Ms. McKown, Ms. Cartin, and Mr. Tomlinson.

41. At this meeting, despite HR's prior assurances to the contrary, Diane was pressured to confront Mr. Wallace face-to-face with her findings.

42. Because of Diane's diligent documentation and reporting on Mr. Wallace's

manipulation of inventory and theft, Mr. Wallace was terminated that same day for manipulation of inventory and the incident set forth in Paragraph 30.

43. Defendant paid Diane $250.00 in recognition of her reporting and thorough investigation of the theft.

44. The day after Mr. Wallace was terminated, Mr. Tomlinson called a meeting with Diane, Mr. Loughlin, Ms. Cartin, Ms. McKown, Assistant Store Manager Morrow Dodge, and new General Manager Jeff O'Hara to discuss store procedure, to introduce Mr. O'Hara to the group, and to discuss that the assembled employees were going to be the "team" that ran the store.

45. Following this meeting, Mr. Loughlin asked Diane "So, did you get your raise? I just got one." Although both Diane and Mr. Loughlin were both supposed to be taking on expanded roles per the team meeting, she had not received a raise.

46. In a February 2, 2017 email, Mr. Tomlinson thanked Diane for her courage in coming forward, and indicated that she would be moving into a new managerial role, that her job duties would be expanding to office management, and that she would be an "integral part of [the] LIHW Management team." **Exhibit B**.

**Second Investigation of Theft**

47. As Mr. Wallace's replacement as General Manager, Mr. O'Hara, a longtime friend of Wallace, became Diane's direct supervisor.

48. Mr. O'Hara made it well-known to employees at the Beaufort location that he was "not going down like Darren."

49. On or around early March 2017, Diane inquired with Mr. O'Hara about how raises were given. Mr. O'Hara's paradoxical response was that he was reviewing <u>new</u> employees' pay rates first and would address long-time employees' pay rates last.

50. As Diane waited for guidance on her additional responsibilities in February and March 2017 per Mr. Tomlinson's email, she began observing and tracking a **second** pattern of significant theft, this time at Defendant's Hilton Head location.

51. Based on the available information and documentation, this theft appeared to be perpetrated by a manager in the Home Décor department who, along with her husband, are close associates of Mr. O'Hara.

52. Consistent with her job responsibilities and pursuant to the Whistleblower Policy, Diane reported the missing inventory, which included furniture, small equipment, and the like, valued at thousands of dollars, to Mr. O'Hara and alerted him to the pattern of theft at the Hilton Head location.

53. Rather than investigate, Mr. O'Hara immediately began a series of retaliatory employment actions against Diane. For example, Mr. O'Hara informed Diane that Mr. Tomlinson had "done a complete 180" on giving her increased responsibilities and placing her in a management position; however, this statement was false as a March 7, 2017 email from Mr. Tomlinson to Diane indicated that he "was under the impression that [she was] already taking on more responsibilities." **Exhibit C**.

54. Mr. O'Hara also removed Diane's access to vital inventory reporting software and security cameras, precluded her from pulling sales reports for department heads, and

9

declined to implement her recommended anti-theft procedures.

55. When Diane inquired as to why her access to the software and cameras had been removed, Mr. O'Hara replied that there was going to be a policy-change "from the top," and that her access to the software and cameras would ultimately be returned.

56. Around the same time, Diane inquired with Mr. Earl Burnsed in IT about when her access would be returned, Mr. Burnsed gave several different reasons as to why her access was still not up and running, none of which reflected Mr. O'Hara's "policy-change" reasoning.

57. On April 23, 2017, Diane sent an email to Mr. O'Hara describing the ways in which these measures effectively prevented her from doing her job and exposed Defendant to substantial economic losses. This email was intended to give Mr. O'Hara a final opportunity to address the theft before Diane escalated her reporting to Ms. McKown and Ms. Cartin.

58. Instead, on Friday, May 19, 2017, Mr. O'Hara called a meeting with Mr. Loughlin (whose job title by this time had changed to "Sales Manager"), Assistant Store Manager Morrow Dodge (neither of whom were Diane's superiors), and Diane, wherein he summarily terminated Diane by saying "Grayco is going to part ways with her." Diane was then immediately escorted off the premises by Mr. Dodge with no opportunity to speak with HR, much less an exit interview.

59. The stated basis for Defendant's termination of Diane that Grayco provided to the South Carolina Department of Employment and Workforce was "lack of work."

60. Despite this stated reason, Diane's position as Inventory Manager was filled the very next business day (Monday, May 22, 2017), by Mr. Paul Ruiz, a less qualified male employee fifteen years her junior who, on information and belief, was to be paid $4.00 more an hour than Diane earned during her tenure.

61. Following her wrongful termination, Diane has experienced emotional pain, suffering, and loss of enjoyment of life, particularly because she has learned of misstatements by current Grayco employees about the circumstances of her discharge that have made her fearful and anxious to participate in social activities in Beaufort, a small community.

**Wage Disparities**

62. The wage disparity described at Paragraph 60 was consistent with Diane's experience that male employees in comparable or less senior positions were paid more than her throughout her tenure.

63. The store management structure at the time of Diane's employment, in descending order of authority, was as follows:

    a. Tier 1: General Manager:  General Manager Jeff O'Hara oversaw the store;

    b. Tier 2: Department Heads, Assistant Store Manager, and Inventory Manager: of equal authoritative stature.

        i. Department Heads: Each department was overseen by a corresponding "Department Head." The general duties of department heads were supervising of employees in their

department, maintaining and keeping up-to-date profitable merchandise, making appropriate orders by keeping apprised on new trends and maintaining regular day-to-day inventory. Upon information and belief, the genders, years worked, and hourly wages of the Departments heads at the time of Diane's dismissal were as follows:

- **Housewares:** Female, employed three (3) years with Defendant, earned $11.00 per hour;

- **Tackle and Outdoor Marine:** Male, employed four (4) years with Defendant, earned $17.00 per hour;

- **Small Equipment:** Male, employed two (2) years with Defendant, earned $18.00 per hour;

- **Hardware:** Male, years employed with Defendant unknown, earned $22.00 per hour;

- **Lawn and Garden:** Male, employed over ten (10) years with Defendant; earned $20.00 per hour;

- **Paint:** Male, years employed with Defendant unknown, earned $16.00 per hour;

- **Plant Nursery:** Female, one (1) year employed with Defendant, hourly rate unknown.

      ii. <u>Assistant Store Manager:</u> Male, employed six (6) or seven (7) years with Defendant, earned $22.00 per hour.

      iii. <u>Inventory Manager:</u> Diane, female, employed three (3) years with Defendant, earned $15.00 per hour.

c. <u>Tier 3: Customer Service Representatives</u>: Below the Department Heads, Assistant Store Manager, and Inventory Manager were customer service representatives, including the following:

      i. Male customer service representative in Hardware; years employed with Defendant unknown; upon information and belief, earned $15.00 per hour;

      ii. Male employed with Defendant three (3) years; upon information and belief, earned $12.00 per hour;

      iii. Male in Equipment Repair service; upon information and belief, earned $16.00 per hour.

64. Diane's role as Inventory Manager was substantially similar to the Department Heads' roles as managers including but not limited to: supervising and supporting store function; working with Department Heads to correct merchandising issues; directing and assisting each Department's staff; attending all Department Head meetings with corporate; and attending each Department's internal meetings.

65. Diane's duties and responsibilities as Inventory Manager in many ways <u>exceeded</u> the responsibilities of the various Department Heads, in that she as she was responsible

for the following non-exclusive responsibilities: Decisions on sales of old inventory in every department; maintaining inventory records; correcting issues by researching errors with Receiving; correcting cashier errors; item maintenance; assisting in receiving and ordering of merchandise; technical support for Department Heads; and creating sales reports outlining old inventory sales and any other report that department heads needed.

### FIRST CAUSE OF ACTION: VIOLATION OF THE EQUAL PAY PROVISIONS OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 206(d)

66. Diane restates and re-alleges the allegations in Paragraphs 1 through 65, as if set forth fully herein.

67. Over her three-and-a-half-year tenure with Defendant, Diane performed work under similar working conditions with equal skill, effort, and responsibility, to the work of male employees in comparable or less senior positions, who were paid a higher hourly wage than her throughout her tenure.

68. Despite her seniority, managerial position, duties and responsibilities, experience and qualifications, Diane was paid less than male employees who had equivalent or less seniority and experience, equivalent or inferior qualifications, equivalent or lesser duties and responsibilities, and held equivalent or inferior positions.

69. While Diane was purportedly terminated for an alleged "lack of work," her position was filled the next business day by a less experienced, less qualified male employee who, upon information and belief, was paid $4.00 more per hour than Diane.

70. Defendant's Employee Manual does not identify a seniority system, a merit system, a system tying earnings to quality or quantity of production, or any other system for determining which employees were eligible for raises.

71. No seniority system, merit system, system tying earnings to quality or quantity of production, or any other system for determining which employees were eligible for raises was ever orally described to Diane.

72. There is no explanation for Diane's inferior compensation other than her gender.

73. This wage discrimination constitutes a violation of 29 U.S.C. § 206(d).

74. Had Diane been paid a wage equal to that of the male employees who performed equal work to the work she performed, she would have been paid at a rate of not less than $18.00 per hour.

75. Diane is entitled to the difference between this rate and the rate earned, calculated over the course of 3½ years, as compensatory and liquidated damages in an exact amount to be proven at trial.

76. Diane is also entitled to compensatory damages for her emotional pain and suffering and loss of enjoyment of life as a result of her disparate treatment, along with recovery of her reasonable attorneys' fees and costs.

### SECOND CAUSE OF ACTION: WRONGFUL TERMINATION IN VIOLATION OF SOUTH CAROLINA PUBLIC POLICY

77. Diane restates and re-alleges the allegations in Paragraphs 1 through 76, as if set forth

fully herein.

78. Under South Carolina law, an employee is wrongfully terminated and not subject to the at-will employment doctrine when she is required by the employer to violate the law.

79. Reflecting the public policy of the State, South Carolina criminalizes and punishes theft, embezzlement, and conspiracy, and aiding and abetting of same by accomplices.

80. After her reports of the second pattern of substantial theft at the Hilton Head location were faced with retaliation and animosity, Diane was forced by Defendant to either become complicit in the theft by ignoring it or covering it up in order to remain employed.

81. After providing her supervisor a final opportunity to address the widespread theft, she was instead wrongfully terminated for failing to be an accomplice.

82. Because Diane was terminated for refusing to aid and abet the criminal theft in violation of clear public policy, she is entitled to compensatory damages (including for emotional pain and suffering) in the exact amount to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF CONTRACT

83. Diane restates and re-alleges the allegations Paragraphs 1 through 82, as if set forth fully herein.

84. When presented to employees, the Whistleblower Policy was a solitary and separate

agreement with its own signature space, and without stating that it was incorporated into the Employee Manual.

85. When the Whistleblower Policy was adopted and implemented by Defendant after Diane successfully reported and investigated the first pattern of widespread employee theft, a contractual relationship between Defendant and its employees was created with respect to whistleblowing activities; thus, the at-will employment doctrine does not apply under the circumstances.

86. Specifically, employees were subject to its mandatory reporting terms and conditions in exchange for protection from retaliation if they reported suspected unlawful and unethical conduct in good faith.

87. Diane complied with her contractual obligations by reporting suspected theft in good faith based on observations made and tracking undertaken as part of her duties and responsibilities as Inventory Manager.

88. Defendant breached its contractual obligations to Diane when it permitted Mr. O'Hara, her direct supervisor, to summarily terminate Diane as retaliation for reporting of theft in accordance with the Whistleblower Policy.

89. Defendant's breach of the contract created by the Whistleblower Policy was willful and intentional as the stated basis for Diane's termination of "lack of work" was clearly pretextual given that her position was filled the next business day.

90. The willfulness of Defendant's breach of the Whistleblower Policy was further evidenced by the fact that Diane was terminated and escorted off the premises in a

17

manner suggesting she was terminated for cause, yet she was never the subject of the corrective disciplinary procedures enumerated in the Employee Manual, namely: verbal warning, written warning, suspension, and investigation into recommended termination.

91. Defendant's stated purpose for the corrective disciplinary procedures in the Employee Manual described in Paragraph 90 are "[t]o help insure that any necessary disciplinary action is taken without unlawful prejudice or favoritism."

92. Based on Defendant's material breach of the employment contract created by the Whistleblower Policy, Diane is entitled to all damages proximately flowing from the breach, including those related to emotional pain and suffering, the exact amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Diane Stoehrer prays for the following relief:

93. Judgment against Defendant for actual damages (including emotional distress) in the amount to be proven at trial, which naturally flow from Defendant's statutory violations, wrongful termination in contravention of South Carolina public policy, and breaches of contract;

94. Judgment against Defendant for punitive and/or liquidated damages, in an amount to be proven at trial, for Defendant's violation of the Equal Pay Act, 29 U.S.C. § 206(d) et seq.;

95. Judgment against Defendant for Plaintiff's reasonable attorneys' fees and costs

incurred in this action; and

96. For such other relief as the Court deems just and equitable.

                                      Respectfully submitted,

Dated: October 27, 2017            /s/Molly R. Hamilton Cawley
                                      Molly R. Hamilton Cawley (#11838)
                                      MHC Law, LLC
                                      1250 Folly Road
                                      Charleston, SC 29412
                                      Tel: (843) 225-8651
                                      molly@mhc-lawfirm.com
                                      **ATTORNEYS FOR PLAINTIFF**

## VERIFICATION

I, Molly R. Hamilton Cawley, declare as follows:

I am the attorney for Plaintiff, and have read the foregoing Complaint with Jury Demand and know the contents thereof. I am informed and believe that the matters stated therein are true and, on that ground, allege that the matters stated therein are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of October, 2017, at Charleston, South Carolina.

                                                     /s/Molly R. Hamilton Cawley
                                                   Molly R. Hamilton Cawley